FARMER, J.,
dissenting.
Sometimes I wonder if a party is talking about the same case I just read. This is one of them. I read the two written agreements involved in this case, and then I read DOP’s claims and briefs, and I am mystified by the clouds of fantasy in its arguments. DOP blithely ignores the words of its agreements and proceeds as though they do not say what they plainly say, do not mean what the words generally mean.
The majority and I agree with the trial judge that DOP has no case regarding the first agreement and that defendants were properly given a summary judgment in their favor on that count. It is with regard to the second agreement and the claim of fraud that we differ.
Text and context matter in these nonstandard business contracts. Both are attached to DOP’s pleading. DOP was the buyer in a real estate purchase agreement it made with the seller, a joint venture named Oakland Hills. DOP wanted the property to build an automobile dealership and showroom. The property adjoined a Miami Subs restaurant operated by Hanover. The sales contract made clear that DOP was buying the site without warranties (except title) and that it was entirely DOP’s own burden to discover any facts at odds with its purpose. In a section of the sales contract titled Purchaser’s Representations and Warranties, the parties recognized and agreed that:
“[DOP] is a knowledgeable and sophisticated developer and operator of real estate properties.[2] [DOP] has reviewed and considered the nature of this transaction and the Inspection Period will enable [DOP] to thoroughly investigate the property. In electing to proceed with this transaction, [DOP] has determined that the property is satisfactory to [DOP] in all respects and [DOP] acknowledges that Seller will convey the Property in an “AS IS” condition as of the closing date and that [DOP] has relied upon its own inspections and due diligence to determine the condition and suitability of the property for [DOP’s] purposes.” [e.o.]
*358 In carrying out its inspections before closing, DOP discovered that there was a septic tank with a “dozing field” on the site. DOP then entered into a second contract with one of the partners (Corn) in the joint venture who was also the owner of the adjoining Miami Subs restaurant site, and with the operator of the restaurant, Hanover. The contract was to settle who would do what in regard to removing the dozing field and connecting the restaurant’s water and sewer lines to the local system. The second contract is quite specific.
The second contract provided for DOP’s engineer to design the line connections and the tie-ins to the local system. Corn would deduct the cost for this engineering service from the sale price of the land. The sewer connection line for the restaurant would allow it to stop depositing waste into the septic tank and dozing field on its adjoining site being purchased by DOP. The agreement goes on to provide:
3. DOP’s contractor shall complete the actual construction and Com will pay the construction costs for extending the water and sewer lines to the restaurant property line. The cost for all work items that are Corn’s responsibility shall be itemized and unitized and shall follow a logical and consistent methodology of construction cost when compared to the cost for the DOP portion of the job and shall be approved by Corn in writing prior to commencement of construction. All construction costs for which Com is responsible shall be deducted from DOP’s mortgage payments ....
4. DOP will remove the existing sewer dozing field located on the DOP site. DOP shall provide Hanover and Corn with the contractor’s estimated cost to complete this work for approval prior to commencement of work. Upon agreement, Hanover shall place the money in escrow with Corn’s attorney. ...
5.DOP’s contractor shall complete the actual installation and Hanover will pay the costs of the tie-in of water and sewer lines from the restaurant site property line to the restaurant and any associated costs such as landscaping, repair of driveway, new water meter, etc., on the restaurant site. All costs to be paid by Hanover for the work will be submitted to it for its approval prior to the commencement of such work, [e.s.]
Each one of these paragraphs begins with what DOP will do. None of them require Corn to do any designing, removing or constructing. None of them require Corn to advance any costs. They do give Corn rights of prior approval as to the designs and the costs that he will indirectly incur by deductions from payments owed by DOP to Oakland Hills or himself.
DOP’s only claim in this case as to an alleged breach of the second contract and any fraud in connection therewith is that Corn failed to remove the dozing field and never had any intention of doing so. DOP does not claim that Corn did anything wrong with regard to the extension of the water and sewer lines to the restaurant property line. Nor does DOP claim any particular problem with the installation and tie-ins of the water and sewer lines. All of its claims are concerned with the removal of the dozing field. The majority opinion overlooks this essential fact.
Paragraph 4 of the second contract deals with the removal of the dozing field. It could not be clearer. DOP agreed to remove the dozing field. DOP was required to provide Corn with its contractor’s estimate of costs for the removal before DOP began work. When Corn and Hanover agreed with the design and costs, the restaurant operator would have to *359 place the costs for the removal of the dozing field in trust with Corn’s attorney. DOP does not suggest how Corn could have breached such provisions, much less allege anything in that regard.
According to the plain contractual text, Corn had no duty to remove the dozing field. Corn also had no duty to lay out any costs when the removal work was done. Corn’s duty of payment was to be accomplished solely by allowing DOP to deduct the cost of removal later from payments it was bound to make. I repeat, DOP agreed to do the work, and Corn agreed to let them deduct the cost from their payments. The majority opinion does not explain how there could be any factual controversy that Corn had breached this removal provision. Or commit a fraud by way of a secret intent not to perform it. What are the disputed facts in that regard? They don’t say.[3]
I hasten to add that DOP did not allege that Corn had unreasonably refused to approve its plans for removal. That would be the only way Corn could have done something contrary to the agreement. For me, that is the end of the dozing field removal claims. They fail to state a cause of action on their face because they directly contradict the two written contracts.[4]
In footnote 1 of the majority opinion the majority quotes the provisions of paragraph 3 dealing with the extension of the water and sewer lines to the restaurant property line. These provisions do not address the removal of the dozing field. The majority fails to mention that DOP’s claims have nothing to do with the extension of the water and sewer lines on the restaurant property. DOP claims that Corn failed to remove the dozing field on the property DOP purchased under the first agreement, not that Corn failed to extend the water and sewer lines.[5]
And even if the construction of the water and sewer lines were the problem, paragraph 3 contains DOP obligations that the majority leaves out of its truncated quotation, an ellipsis that is very telling. The omitted provision requires that the costs be “itemized and unitized.” DOP’s proposed costs were required to follow a logical and consistent methodology in comparison to the cost for the removal of the dozing field. Did they do so? Would not Corn have been entitled to reject the pro *360 posal if it did not comply with these requirements? The footnote does not mention these matters.
I repeat. There is no factual controversy as to either a breach of contract or any fraud in connection with the second contract. This entire case is built around DOP’s mystifying insistence that Com agreed to remove the dozing field. Yet the contract shows clearly that Corn had no such obligation and that in fact it was DOP who contracted to do so. DOP has not alleged that it actually submitted reasonable proposed costs to do the removal that complied with the contract, or that Corn unreasonably refused to approve the plan. DOP talks about Corn actually taking over the removal work at some point, but again DOP has not alleged that Corn took unreasonably long to do so after governmental authority to proceed had been given. As this case was pleaded by DOP, there is absolutely nothing left to try. The trial judge made no error in entering summary judgment against DOP.

. DOP itself recognized that it was not your ordinary Mom and Pop buying swampland from a wicked city man with secret knowledge who represented otherwise. Nor can we indulge any suspicion that DOP was unused to legal language in real estate contracts and perhaps misunderstood the import of the text from the sales agreement quoted above.

. As an aside, the fraud claim raises that other curiosity of commercial law, whether a party can be found guilty of fraud for harboring a secret intention never to perform an agreement when made. In this instance, DOP's fraud allegation is unlike the prototypical model. Corn stands accused of secretly hiding an intent not to remove the dozing field himself, when the actual contract was that DOP would do the work. The majority does not explain how there could be any factual dispute about a party misrepresenting an intention to perform an agreement requiring performance by someone else.

. In some mysterious way DOP makes the actual words of the second contract fade away and transform themselves. Theirs is a Cheshire Cat version of the contract. Perhaps DOP’s claim is like Humpty Dumpty saying: "when I use a word it means just what I choose it to mean — neither more nor less.” Lewis Carroll, Through The Looking Glass (1872). As in Wonderland, DOP makes perverse changes in written words to mean their opposite. Like Alice, my response is to wonder how “can [DOP] make words mean so many different things?” Perhaps for DOP, as it was for Humpty Dumpty, the real issue is "which is to be master [words or speaker]— that’s all.” Id. I think the contract’s words should be master. I have no dominion over them.

.The majority says that DOP alleged that more than 20 months after closing on the first agreement the dozing field still had not been removed. Yet at oral argument DOP said that the dozing field had been removed and that its complaint was that it was precluded from using the land until the removal was complete.